## WALTER E. HELLER AND COMPANY, INC. v. KYRWOOD WARNER AND ANOTHER.

163 N. W. (2d) 573.

December 20, 1968—No. 40979.

*Robert Rice* and *Rice & Evans,* for appellants.

*Carl E. Erickson,* for respondent.

Heard before Knutson, C. J., and Nelson, Murphy, Otis, and Frank T. Gallagher, JJ.

FRANK T. GALLAGHER, JUSTICE.

Defendants appeal from a denial of their motion for judgment notwithstanding the verdict or a new trial following a directed verdict in favor of plaintiff.

In August 1960, E. G. Clinton Company (Clinton) erected a building suitable for raising chickens on the farm of defendant Kyrwood Warner pursuant to an order solicited from and signed by him and by his father, defendant John Warner, on June 29, 1960. The order stated that the price for the building was $21,962 and the terms were $5,420 down with a 6-year payment plan and quarterly payments. The order was subject to company approval, and a "credit check" was conducted before the downpayment check was cashed in late July 1960.

It is undisputed that Kyrwood Warner was to attempt to secure outside financing and was unable to do so. The Clinton salesman told him that financing could be arranged through Clinton. Although it is not clear from the record, it appears that these arrangements were made during the interval used for the "credit check." The original plan was to finance through Universal CIT, but the financing was eventually arranged through Thorp Finance Corporation (Thorp).

On October 11, 1960, Clinton's treasurer went to the Warner farm and secured the signatures of Kyrwood Warner and his wife, Carmen, on a note in the amount of $21,983.60 and a real estate mortgage securing payment of that amount on the property on which the new building

was located. The note provided for payment in 19 consecutive quarterly installments of $1,099.18 each and stated that it was secured by an installment sales contract and real estate mortgage. No installment contract was signed until December 29, 1960. When signed, it stated the total price as $27,403.60, the cash price as $21,962, the "time price differential" as $5,441.60,[1] and the downpayment as $5,420, leaving $21,983.60 as the unpaid balance. The payment terms were the same as those in the note signed October 11, except that the contract specified 20 payments whereas the note specified 19.

Clinton's treasurer and Kyrwood Warner both testified that the reason the installment contract was signed in December rather than October was to permit payment of the first quarterly installment to coincide with the first sale of chickens to be raised in the building. It was expected that there would thus be funds available to make the payment when it came due. The treasurer also testified that the note and mortgage were obtained at Thorp's request, and the installment contract form was provided by Thorp. Clinton assigned the contract to Thorp the day it was signed and was paid the discount price, $16,542.

On August 25, 1961, the conditional sales contract was reassigned to Clinton by Thorp and on August 30 Clinton assigned it to plaintiff, Walter E. Heller and Company, Inc. (Heller), a nationally known company engaged in the finance business. The latter assignment was part of a blanket assignment of over a million dollars in accounts. Because Heller did not wish to rely on the blanket assignment to transfer real estate mortgages, the mortgage from Kyrwood Warner and his wife to Clinton was assigned individually on June 17, 1963. The contract, note, and mortgage signed by the Warners were all in the possession of Heller from the time of the blanket assignment on August 30, 1961.

Kyrwood Warner made the required payments to Thorp and then to Heller regularly until February 1964, at which time there was an unpaid balance on the contract and note of $11,599.85. Heller commenced this action to recover that amount, and the Warners defended on the ground

---

[1] This figure was computed by what is known as the "six and a half percent add-on" method, which produces a return that would be in excess of 11 percent if figured as simple interest, rather than as a time-price differential.

that the note they had signed was usurious. The trial court directed a verdict in favor of plaintiff, and defendants appeal.

The Warners raise basically three issues: (1) Whether the original order was in fact a contract for sale, making the subsequent acceptance of the note by Clinton a forbearance; (2) whether the conditional sales contract (executed some months after the note and long after the building was completed) is a valid conditional sales contract so as to remove the case from the usury laws; and (3) whether plaintiff, in taking the contract, the note, and the mortgage on an assignment for value, can qualify as a bona fide purchaser so as to avoid the defense of usury.

■ The order form stated that the order was subject to acceptance by Clinton; that title to the material would remain in Clinton until it was fully paid for; and that in the event of any default, Clinton could declare the entire remaining unpaid balance immediately due and payable. It specified a 6-year payment plan. Clinton's treasurer testified that it appeared from the order that Warner was to get his own financing since Clinton had no access to 6-year financing, and that as far as Clinton was concerned it was a cash sale. The invoice for the material sent by Clinton showed that it was "charged," which meant it was shipped on open account. Clinton sent Kyrwood Warner a statement showing the balance due September 29, 1960, as $16,542.

The fact that Clinton did not have a 6-year financing plan indicates that there was more to the agreement of the parties than is contained in the order, and the testimony of both the company's treasurer and Kyrwood Warner bears this out. Warner was to finance the building himself if he could, which meant that as between Clinton and Warner the sale would be for cash. If Warner could not get financing, Clinton would arrange it for him. It appears from the record that prior to the time the order was signed it was discovered that Warner would be unable to obtain his own financing. The back of the customer's copy of the order introduced by defendants bears a penciled notation, "Credit Mrs. Gen Stokes." Genevieve Stokes was treasurer of Clinton. Warner testified that he had understood that if he could not obtain his own financing and pay the total amount in cash he would be making a contract which would most likely be sold to a finance company. He also stated that he

had no personal contact with Thorp other than sending the payment checks to it after the assignment. As stated, it appears from the record that Clinton arranged for financing in the interval between the receipt and the deposit of the downpayment check. Therefore, it does not appear that the Warners' contention that the order was the complete contract, entitling Clinton to demand full payment, is sound. Had such a demand been made, Warner could properly have claimed that Clinton had assumed the obligation of securing financing and should not have built the building without doing so..

■ The Warners' claim that the conditional sales contract was nothing more than an attempt by Clinton to avoid the usury laws after previously causing the Warners to sign a usurious note may be answered on two grounds:

First, it is contradicted by Kyrwood Warner's own statement that the contract and note were not signed at the same time in order that quarterly payments would coincide with his receipt of payment for each batch of chickens raised in the building. The Warners had encountered difficulty in obtaining birds; although the building was ready by the end of August 1960, they could get none until December of that year. In short, it was to their benefit to defer signing the contract. That the contract and note were to have been signed at the same time is indicated by the fact that the note states that it is secured by a real estate mortgage and installment sales contract "of even date herewith." Had the note and contract been signed at the same time, the facts here, except for the existence of the mortgage, would be identical in all material respects to those in In re Bibbey (D. Minn.) 9 F. (2d) 944. There it was held that, in the sale of an automobile, the excess in cost specified in the note and installment contract signed by the purchaser over the agreed cash sale price was due to a higher price the dealer could rightfully demand for a time sale and not usurious interest on a loan for the price of the car. The court stated that the fact that immediate sale of the contract to a finance company was contemplated made no difference. 9 F. (2d) 945.

Second, in numerous cases and many jurisdictions, where, in exchange for goods, a buyer has given a note providing for payment of an amount which, if interest, would exceed the legal rate, the courts have

treated the note as evidencing an installment contract providing for a higher time payment. These cases are set out in Annotation, 14 A. L. R. (3d) 1065, 1112 to 1118, and an extensive discussion of them here would serve no useful purpose. However, particular attention should be called to Morris Plan Industrial Bank v. Faulds, 269 App. Div. 238, 55 N. Y. S. (2d) 372, in which the facts are very similar to those in the present case.

■ The Warners contend that the acceptance of the real estate mortgage by Clinton is inconsistent with retention of title in the seller under an installment sales contract and, therefore, that this case should be considered a cash sale with the note a forbearance at a usurious rate, citing Kettwig v. Aero Investment Co. 191 Minn. 500, 254 N. W. 629. In Kettwig, the plaintiff purchased a car on a conditional sales contract. The contract was assigned by the dealer and when plaintiff could not make the payments the defendant purchased the contract from the assignee, lent the plaintiff $50, and took a chattel mortgage on the car as security for the loan. When the plaintiff defaulted on the contract the defendant repossessed the car and sold it without giving the notice required for foreclosure of a chattel mortgage. Plaintiff sued for conversion. The court held that acceptance of the mortgage was inconsistent with retention of title under the contract and that defendant had released, or was estopped from asserting, its title so that it had only a mortgagee's interest in the vehicle.

Kettwig differs from the present case in many respects. For one thing, the mortgage there was to secure an independent loan made subsequent to the sale under the contract. The major distinction, however, is that in Kettwig the property actually sold under the contract was covered by the mortgage, whereas in the present case the property sold was material to construct a building and the mortgage covered the land on which that building was constructed. Accepting a mortgage on the land, to which the Warners clearly had title, is not inconsistent with retention of title to materials used in constructing the building upon that land under a conditional sales contract. The desirability of being able to reach both the land and the building in the event of a default by the purchaser is obvious.

■ Dunn v. Midland Loan Finance Corp. 206 Minn. 550, 289 N. W. 411, held that for a sale of personal property to constitute a loan or forbearance of money, it must be a mere form or device to evade the usury law; and that an owner of property is entitled to set a different price for a credit sale from that set for a cash sale. Therefore, the court concluded, conditional sales contracts were not subject to the usury law (Minn. St. 334.01). The court further stated (206 Minn. 556, 289 N. W. 414):

"The fact that defendant indicated to the dealer the terms on which it would buy the contract between plaintiff and the dealer does not show that the transaction was a loan. The decisions have gone further than we are required to do here. A finance company is not regarded as loaning money to a dealer's customer simply because it furnishes the dealer with schedules of discounts, forms of contract, assignment, and other instruments to be executed, and solicits the purchase of such paper from the dealer. Commercial Credit Co. v. Tarwater, 215 Ala. 123, 110 So. 39, 48 A. L. R. 1437; General Motors Acceptance Corp. v. Swain (La. App.) 176 So. 636."

■ The present case was clearly a bona fide sale of goods. By his own testimony, Kyrwood Warner was aware that he was to sign a contract for payment if he could not finance the purchase himself. He was also aware, or at least should have been from the fact that the October 11 note was for more than the September statement indicated his unpaid balance to be, that the price would be higher if he paid on time. Therefore it must be concluded that the usury laws of the state are not applicable to this transaction. As was stated in In re Bibbey, *supra*, the presence of a prearranged plan to assign the sales contract does not alter this conclusion.

The Warners contend that the exception to the usury laws found in Minn. St. 334.03, whereby the defense is not good against bona fide purchasers for value of usurious negotiable paper prior to maturity, does not apply, in that Heller is not a bona fide purchaser and the paper purchased (the note, mortgage, and contract) was not properly negotiated. Since we have determined that the transaction here was a valid installment

sale to which the usury laws do not apply, there is no need to reach this question. Even if Heller is not a bona fide purchaser, since the usury laws are inapplicable, the exception is unnecessary for recovery of the amount owed by defendants.

Affirmed.